**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-330 (BAH)** |
| **v.** | : | |
| | : | |
| **DAVID MULLSTEFF** | : | |
| **ERIC OLIVER,** | : | |
| | : | |
| **Defendants.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. David Mullsteff has pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1) (entering and remaining in a restricted building or grounds). Eric Oliver has pleaded guilty to two second-degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) and a violation of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in any Capitol building). For the reasons set forth herein, the government requests that this Court sentence Mullsteff to 60 days' home detention as a condition of 36 months of probation, and a $5,000 fine, and sentence Oliver to 14 days' intermittent confinement as a condition of 36 months of probation, and a $5,000 fine. Additionally, the government requests each defendant be ordered to pay $500 in restitution.

### I.    Introduction

Defendants David Mullsteff and Eric Oliver, along with their co-defendant Brandon Pettit, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the

1

peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

The government's recommendation is supported by each defendant's conduct at the Capitol, as well as by their varying attempts to minimize their conduct in statements made after January 6, and by Oliver's lack of remorse, as well as considering each defendant's particular history and characteristics. Both defendants' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for their actions alongside so many others, the riot likely would have failed.

## II.    Factual and Procedural Background

### The January 6, 2021, Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 45 and 48 (Statements of Offense).

### Defendant Mullsteff's and Oliver's Role in the January 6, 2021, Attack on the Capitol

David Mullsteff and Eric Oliver traveled to Washington D.C. with their co-defendant Brandon Pettit[2] on the morning of January 6, 2021 from their homes near Richmond, Virginia. Oliver had previously written on Facebook that "[i]t stops the 6th and I will be there[.]" Mullsteff,

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[2] Pettit was sentenced on November 1, 2024, to 30 days' home detention as a condition of 24 months of probation, $500 in restitution, and a $5,000 fine.

Oliver, and Pettit attended the Stop the Steal Rally at the Ellipse and stayed for the entirety of former President Donald Trump's speech.



***Images #1 and #2: Mullsteff (yellow circle), Pettit (blue circle), and Oliver (red circle) at the Stop the Steal Rally***

After former President Trump's speech concluded, Mullsteff, Oliver, and Pettit walked to the Capitol grounds. The three approached the Capitol from the west side of the building where rioters had clashed with police and tear gas and flash bang-type munitions had been deployed. As evidenced by photographs later recovered from Oliver's cell phone pursuant to a search warrant, Mullsteff, Oliver, and Pettit could see rioters on the Capitol grounds, climbing the scaffolding, media tower, and construction equipment.



*Image #3: Photograph from Oliver's Phone of Rioters Climbing Scaffolding and Media Tower*



*Image #4: Photograph from Oliver's Phone of Rioters Climbing Construction Equipment*

Each of the three men later admitted to the FBI that they saw the chaos on the West Front. Mullsteff admitted to FBI agents that, while on the West Front, he heard a banging noise, saw tear gas in the air, and saw rioters carrying flags on the Upper Terrace of the Capitol. Oliver also described rioters on the Upper Terrace. Oliver said that as he, Mullsteff, and Pettit approached the building, he saw a rioter take a coat rack from the Capitol and heard another rioter yelling "ya'll killed her." Despite the obvious chaos on the West Front, Mullsteff, Oliver, and Pettit advanced towards the building to the Upper West Terrace and into the Senate Wing Door. The below

photograph, recovered from Oliver's phone, shows police in riot gear on the Upper West Terrace outside the Senate Wing Door area.



***Image #5: Photograph from Oliver's Phone of Police in Riot Gear Outside Senate Wing Door***

Mullsteff, Oliver, and Pettit entered the U.S. Capitol building at approximately 3:21 p.m. At that time, numerous police officers were inside the foyer area wearing riot helmets, and an alarm was blaring continuously. Some of the rioters exited the building through a smashed window directly next to the Senate Wing Door. As they entered the building, Oliver recorded Mullsteff ahead of him in the entryway as an audible alarm blared continuously.



***Image #6: Screenshot from Government Exhibit # 1 at 00:01, a Video from Oliver's Phone of Mullsteff (yellow circle) Inside Senate Wing Door***



***Image #7: Screenshot from Government Exhibit # 2 at 00:27 Showing Mullsteff (yellow circle)***
***Oliver (red circle) and Pettit (black circle) Enter through the Senate Wing Door***

While inside the Capitol, Mullsteff appeared to "fist-bump" a few police officers. *See Gov.*

*Ex. 2* at approximately 1:15 – 1:30. Mullsteff also appeared to record on his phone before he exited

through the Senate Wing Door at approximately 3:24 p.m.



***Image #8: Screenshot from Government Exhibit #2 at 1:55 Mullsteff Recording on His Cell***
***Phone Inside the Capitol***

Oliver advanced inside the Capitol from the lobby area into a hallway which leads to further interior portions of the Capitol building. Oliver then turned around and returned to the Senate Wing Door area and held up his cell phone and recorded the crowd in the building. Prior to exiting, Oliver again held up his cell phone above the crowd, turned it horizontally, and took a photo of police officers blocking a hallway.



***Image #9: Screenshot from Government Exhibit # 2 at 2:07 Showing Oliver Walking Down Hallway Toward the Crypt***



***Image #10: Screenshot from Government Exhibit #2 at 4:19 Showing Oliver Filming or Photographing on his Cell Phone***

One of the images that Oliver took around this time was recovered from his phone as shown below in Image #11.



**Image #11 Photograph of Police Blocking Hallway Recovered from Oliver's Phone**

After exiting the Capitol at approximately 3:26 p.m., Mullsteff, Oliver, and Pettit proceeded northeast around the building to the North Doors area. In his interview with the FBI, Oliver described seeing people being violent and pushing police officers, and stated that he and his co-defendants left the Capitol because the situation was becoming dangerous.

*Oliver's Post-January 6 Facebook Posts*

Immediately after the attack on the Capitol and in the days that followed, Oliver responded to several comments on Facebook by perpetuating lies and conspiracy theories about the riot. Below are examples of some of Oliver's posts:

- On the evening of January 6, 2021, Oliver commented on a post that "It was peaceful. I'm here. The only hostile people were the ones that broke inside the building. Which is when the girl got shot. After that most people were just standing around the capitol."

- Also on January 6, Oliver replied to a comment "don't believe the fake news. I've got video and tons of pictures that tell the real story."

- On January 6, he replied to another comment, "let me clear something up. It was antifa that broke windows and went in the capitol[.]"

- Also on January 6, Oliver wrote "yes see they were antifa trying to put a bad name on the protest[.]"

- On the evening of January 6, Oliver opined that "This was a set up."

- Also on the evening of January 6, Oliver commented on a post that "The people that caused all the trouble were antifa. I saw these people with my own eyes today" (referring to the below photograph):



*Image #12: Recovered from Oliver's Facebook Records*

- On January 7, 2021, Oliver replied to a comment, stating "I personally was not a part of any of the bs that went down yesterday. I was there. I and all I can say is it smelled very fishy once we arrived at the capitol. They got inside very easily. Also, how the hell did they know where the chambers were. That place is huge."

- Also on January 7, Oliver replied to a comment stating that "the capitol police let them in the capitol. Not from the back of the building but from the front. Think about it. All the video footage shows before the advancement and then after the advancement. Where is the footage of them actually getting through the capitol police?"

- On January 7, Oliver replied to a comment stating that "it was a set up. The police let them in and framed it as they stormed the building."

- Also on January 7, 2021, another individual sent Oliver messages on Facebook which stated "That woman died mike pence is a trader" and "they blocked trump from everything

and there is so much information about shit that needs to get out[.]" Oliver responded by writing "Yep. This is war on our country[.]"

- On January 13, 2021, Oliver forwarded a lengthy post to Mullsteff about various topics including that antifa was responsible for the riot at the Capitol, claims about election fraud, and that President Trump would not leave office. Oliver added at the end of the message "The rally in DC was an awesome event For what it's worth." Mullsteff replied, "We will see."

*Mullsteff's FBI Interviews*

On January 15, 2021, Mullsteff was interviewed by the FBI at his place of employment. During the interview, Mullsteff admitted to being present at the rally in Washington D.C. on January 6, 2021. Mullsteff described a large crowd that "looked like a million people" walking from the rally in the area of the Ellipse to the Capitol building. Mullsteff stated that he followed the crowd. Mullsteff told the FBI that by time he got to the Capitol grounds, the situation was already chaotic. Mullsteff opined that some people at the Capitol looked like they did not belong with the crowd. Mullsteff said that while in the grass on the west side of the building, he heard some banging, saw tear gas in the air, and observed people on the Upper Terrace of the Capitol. During the interview, Mullsteff denied seeing any signs saying "Do Not Enter" and denied crossing any barriers. Mullsteff stated his reason for attending the rally was to "save the republic." Mullsteff provided the FBI with the names of the two co-defendants in this case.

On February 17, 2022, Mullsteff was interviewed a second time by the FBI. During that interview, Mullsteff stated he was unaware of how violent the riot at the Capitol was on January 6, 2021, until he watched a video of the events produced by the New York Times. During this interview, Mullsteff identified pictures of his two co-defendants as the people he went to the Capitol with on January 6. During this interview, Mullsteff stated he attended the rally to hear President Trump speak and because he wanted to protest the contested electoral college votes, such as from the state of Georgia. Mullsteff stated that he did not see any violence while he was inside

10

the building and described "fist bumping" multiple police officers. Mullsteff stated one of the

reasons he entered was to try to find a bathroom inside the building. Mullsteff claimed he first saw

violence after exiting the Capitol on the north side of the building.

### Mullsteff's Statement to the United States Probation Officer

Mulsteff provided a written statement to the United States Probation Officer in which he

wrote:

> I deeply regret entering the Upper West Terrace and into the Senate Wing Door of the US
> Capitol Building on January 6, 2021. I should not have entered the Capitol to see what was
> taking place that day. Although there was no fighting or rioting in the area where I entered
> the Capitol and the horrible conduct that occurred at the Capitol had subsided over an hour
> earlier, I should have known better. The 3 minutes that I was in the Capitol, during which
> time I fist-bumped and thanked as many of the Capitol Police as possible for their service.
> Additionally, I stopped another individual from harassing a female Capitol Police Office,
> when I told them to leave her alone, she is just doing her job. At which time that individual
> walked away. My actions on January 6th have changed my life and the lives of many others
> forever. Although I did not personally damage any part of the Capitol and I did not engage
> in any conflict with the Capitol Police, I am now aware that my actions contributed to a
> very bad situation for which I am deeply sorry! I attempted to make amends for my actions
> and fully cooperated with the FBI giving the Special Agent a statement on January 15,
> 2021, offering my assistance again on May 25, 2021, and then again on February 17, 2022.
> I was originally told that after hearing my statement we most likely would not be charged
> for our conduct. This was a huge sigh of relief at that first meeting with the FBI. 2 years
> went by and we found out in June of this past year that a new Special Agent and new
> Prosecutor were assigned to our cases and that I along with Mr. Oliver and Pettit were
> being charged. I am deeply sorry for my actions and I have taken full responsibility for my
> actions from the first meeting with the FBI. I also assure the court I will never be involved
> in any protests, rallies, movements, groups or any activity that may reflect badly to the
> court or to my reputation.

PSR ¶ 31.

### Oliver's FBI Interview

On May 25, 2021, Oliver was interviewed by the FBI about his participation in January 6,

2021. Oliver admitted to attending the rally at the Ellipse. He stated his reason for going was to

"be a part of history." Oliver discussed attending the rally with Mullsteff and Pettit and identified

them during the interview. Oliver stated that while he was at the rally, he became separated from

Mullsteff and Pettit, but later reconnected with them before walking to the Capitol building. Oliver estimated the crowd to be over a million people. Oliver described standing on the West lawn at the Capitol grounds, observing the crowd for one and a half to two hours with Mullsteff and Pettit, including seeing people on the Upper Terrace of the Capitol. Oliver stated he and his codefendants were curious and began walking to the side of the building where he heard a person yell "ya'll killed her" and saw another person carrying a coat rack he believed to be stolen from the Capitol. Oliver stated that Mullsteff entered the building first with him and Pettit following. Oliver stated he shook a police officer's hand and observed Mullsteff fist-bump officers. Oliver stated he was inside the Capitol for about one to two minutes and observed no violence inside. Oliver noted that the police seemed to be ushering the crowd. Oliver stated that no one told him he could not enter the building and denied seeing barriers or signs prohibiting entry. Oliver stated that, after leaving the building, he observed people being violent and pushing police. He and his co-defendants then left the Capitol because they felt the situation was becoming dangerous. Oliver showed agents a video he recorded while he walked into the building and described recording a Facebook live. Oliver stated during the interview "if going in a building, taking a few steps and leaving is illegal then I'll take my misdemeanor and pay the fine."

*The Charges and Plea Agreement*

On July 18, 2024, the United States charged Mullsteff, Oliver, and Pettit in a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). On October 4, 2024, pursuant to their plea agreements, Mullsteff pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(1), and Oliver pleaded guilty to Counts Three and Four of the Information, charging him with violations of 40

U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). By plea agreements, Mullsteff and Oliver each agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

As noted by the plea agreements and the U.S. Probation Office, Mullsteff faces up to one year of imprisonment and a fine of up to $100,000, while Oliver faces up to six months' imprisonment and a fine of up to $5,000. Mullsteff and Oliver must also pay restitution under the terms of their plea agreements. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  With respect to Oliver, his offenses are Class B misdemeanors so the Sentencing Guidelines do not apply to them. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Mullsteff's Guidelines Calculation

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49. The government agrees with the guidelines calculation set forth for Mullsteff in the PSR:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | <u>-2</u> |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶ 8.

U.S.S.G. § 4C1.1 provides for an additional two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. While the

Government concedes that Section 4C1.1 applies to Mullsteff, the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because the defendant's presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that the defendant in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus, Mullsteff's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on

January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

The U.S. Probation Office calculated that Mullsteff has zero criminal history points and is therefore a category I. PSR at ¶¶ 9, 45. Accordingly, the U.S. Probation Office calculated Mullsteff's total adjusted offense level, after acceptance, at 2, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶¶ 42, 84. Mullsteff's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 60 days of home detention as a condition of 36 months' probation and a $5,000 fine for Mullsteff, and a sentence of 14 days' intermittent confinement as a condition of 36 months of probation and a $5,000 fine for Oliver.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Mullsteff's

and Oliver's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for misdemeanor defendants, the absence of violent or destructive acts is not a mitigating factor. Had Mullsteff or Oliver engaged in such conduct, they would have faced additional criminal charges.

### B. Mullsteff's History and Characteristics

According to the PSR, Mullsteff, age 62, credits his success in life to his father and mentors. Mullsteff is married and has two children and four grandchildren. He has no criminal history prior to January 6, 2021 (excluding multiple driving infractions, all dated) Mullsteff operates his own businesses, Cables Plus LLC and Tactical Deployment Systems. The PSR estimates is net worth at nearly 4.1 million dollars. PSR ¶¶ 43-49, 52, 53, 67, 69.

### C. Oliver's History and Characteristics

Oliver, age 44, is engaged and has three children with his fiancé. Oliver also has a child from a previous marriage. According to the PSR, he is a sales manager with JES Foundation Repair, overseeing 17 individuals, and has a net worth of over $600,000. PSR ¶¶ 51-54, 68, 71.

From 2001 to 2014, Oliver accumulated a number of criminal convictions, including (1) a misdemeanor for driving after forfeiture of a license (2001), (2) misdemeanor accessory after the fact in a felony (2001), (3) misdemeanor hit and run and driving under the influence 0.2%+ (2005), (4) driving under the influence – subsequent offense (2006), (5) entering property to damage, in domestic relations court (2007), (6) failure to appear on a misdemeanor (2007), (7) trespass (2008), (8) driving while intoxicated – level 2 (2010), (9) felony driving under the influence – 3rd offense within 5 to 10 years (2011), and (10) felony driving under the influence (2014). Oliver was released from his last period of incarceration in 2016 and probation was terminated in 2017. In addition to his numerous criminal convictions, Oliver also was found to have violated probation and "good

behavior" during the above time frame. As reported in the PSR and reflected by the nature of some of his convictions, Oliver struggled with substance abuse issues, first using marijuana at age 14, then cocaine at age 17, later experimenting with heroin, and, during the above time frame, consuming alcohol, which he identified as the substance that caused him the most problems. He participated in various treatment programs while incarcerated and after release. He states that his recovery date was in October 2013 and, according to his sister, he is doing well now. PSR ¶¶ 61-63.

Despite his criminal record, Oliver has been able to find and maintain steady, well-paying employment, purchase a home, and care for his family.

### D. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of home detention for Mullsteff and a period of intermittent confinement for Oliver. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### E. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

General deterrence may be the most compelling reason to impose a sentence of home detention in this case for Mullsteff and intermittent confinement for Oliver. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence – Mullsteff*

While Mullsteff pleaded guilty to a Class A misdemeanor and stated in the PSR that he "deeply regret[s]" his role in the Capitol riot, his statement significantly downplays his unlawful conduct. He says he merely entered "to see what was taking place that day." PSR ¶ 31. Mullsteff has given various explanations for entering the Capitol. In a statement in the FBI, he said he was looking for a bathroom, in another he emphasized that he didn't see any signs saying not to do so, and now, in his statement to the Probation Officer in the PSR, he asserts he was merely curious and trying "to see what was taking place that day." His statements to the FBI and acknowledgement to the Statement of Offense, however, make clear he knew exactly what was going on – Congress was supposed to meet in the Capitol to certify the electoral college vote count for the 2020 presidential election.

Mullsteff went on in his statement to probation claiming that there was no rioting in the area where he entered the building and that the "horrible conduct that occurred at the Capitol that day had subsided over an hour earlier." PSR ¶ 31. Mullsteff in fact entered with a large crowd that

outnumbered the police, where windows had been smashed, and an alarm blared continuously. As the Court knows, the violence did not subside "over an hour earlier" (i.e., at 2:30 p.m.) as Mullsteff suggests; rather it continued for hours on Capitol grounds until the rioters were cleared at nearly 6 p.m. The evidence in this case shows that Mullsteff and his co-defendants were on the West lawn for at least an hour or more before they entered through the Senate Wing Door at 3:21 p.m. As this Court is aware, there was significant violence at the Capitol during that time, and even Mullsteff acknowledged in his FBI interview that the situation outside the Capitol was chaotic when he, Oliver, and Pettit arrived, and he admitted that he heard some banging and saw tear gas in the air. It's also clear that after Mullsteff and Oliver exited the building, they remained on Capitol grounds long enough to witness violence at the North Doors entrance to the building.

In his statement, Mullsteff emphasized that he fist-bumped several Capitol Police officers and claimed he stopped another rioter from harassing a female Capitol Police officer. PSR ¶ 31. Mullsteff's self-aggrandizing assertions – that he fist-bumped police and thanked them, and stopped another rioter from harassing a female Capitol Police officer who was "just doing her job" – are ironic: the "job" the Capitol Police were doing was trying to protect Congress and the Capitol from the hordes who had invaded– including Mullsteff and his codefendants.

Mullsteff also states that he didn't damage property or "engage in any conflict with the Capitol Police." PSR ¶ 31. Of course this is not mitigating. Had he done so, he would have faced additional charges. Mullsteff's conduct must be deterred and a period of home detention and a fine is appropriate in this case.

*Specific Deterrence – Oliver*

While Oliver's conduct is similar to that of his codefendants, a period of intermittent incarceration is appropriate to specifically deter him from future criminal conduct. Oliver has a

19

clear history of disrespect for the law as shown by his history of repeated convictions for the same behavior (driving while intoxicated and related offenses) as well as his related violations of probation and "good behavior." Oliver expressed no remorse to the Probation Officer who prepared the PSR, and in fact, when he was interviewed by the FBI, he defiantly stated "if going in a building, taking a few steps and leaving is illegal then I'll take my misdemeanor and pay the fine." After the riot, Oliver perpetuated conspiracy theories about the riot on Facebook, claiming it was a set up rather than conceding that he did anything wrong. To this day Oliver has expressed no remorse for his conduct.

Oliver's disrespect for the law is further demonstrated by several photographs recovered from his phone. Despite being a convicted felon,  on November 3, 2020, approximately two months before his criminal conduct in this case, Oliver posted a photograph on Facebook that shows him in a hunting tree stand with what appears to be a rifle slung over his shoulder. The caption with the photograph reads "1st day out. Looking for that monster 🐕."



***Image # 13 Picture Recovered from Oliver's Facebook Account of him Hunting with a Rifle Slung Over his Shoulder***

Further, on December 14, 2020, another person posted the below photograph on Facebook and Oliver messaged the other person to inquire about purchasing the pictured assault rifles. After being told that the other person already sold the firearms, Oliver wrote "Damn."



***Image # 14 Picture Recovered from Oliver's Facebook Account of Assault Rifles for Sale that Oliver Inquired about Purchasing***

### F.    The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[3] This Court must sentence the defendants based on their own conduct and relevant characteristics, but should give substantial weight to the context of their unlawful conduct: their participation in the January 6 riot.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Mullsteff has pleaded guilty to Count One, Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1), which is a Class A misdemeanor. 18 U.S.C. § 3559. Oliver has pleaded guilty to Count Three, Disorderly and Disruptive Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and Count Four, Parading, Demonstrating, and Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). These offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The most obvious comparator is the sentence imposed on Mullsteff's and Oliver's co-defendant Brandon Pettit. This Court sentenced Pettit on November 1, 2024, to 30 days of home detention as a condition of 24 months of probation, $500 in restitution and a $5,000 fine. There are some distinguishing factors that account for the government's higher recommendation here for both Mullsteff and Oliver. Unlike Pettit, in their post January 6 statements, Mullsteff and Oliver have significantly minimized their role in the riot and their actions that day. The evidence showed Pettit was clearly hesitant in entering the Capitol and chose to remain right next to the entrance for less than a minute before leaving, while Mullsteff and Oliver advanced further into the foyer and

stayed for several minutes. Pettit sought to plead guilty immediately after his arrest and displayed earnest remorse in his statement in the PSR, while Oliver was defiant. Oliver also downplayed his actions in his statement to the FBI, perpetuated conspiracy theories about the riot, and has a lengthy criminal history demonstrating his disrespect for the law.

In *United States v. James Lollis,* 21-cr-00671 (BAH), the defendant entered through the Senate Wing Door at 3:22 p.m. While inside, the defendant asked an officer if he was on "the same team" and taunted the officer when he did not receive a response. The defendant exited the Capitol at approximately 3:27 p.m., but did not leave Capitol grounds, instead staying to watch the violence on the Lower West Terrace. This Court sentenced Lollis to three months of home detention, as a condition of 36 months of probation and $500 in restitution. Mullsteff and Oliver participated in similar conduct. While neither of them taunted officers, they both have sought to minimize their conduct. Also, Lollis had no criminal history, unlike Oliver thus justifying a higher sentence.

In *United States v. Brian Stenz,* 21-cr-00456 (BAH), the defendant entered through the Senate Wing Door of the Capitol at approximately 2:43 p.m. with another individual and walked around the Capitol for approximately 8 minutes taking photographs inside the Capitol including Senator Merkley's Office. This Court sentenced the defendant in Stenz to 14 days of incarceration and 2 months' home detention as a condition of 36 months' probation, a $2,500 fine, and $500 restitution. Unlike Mullsteff and Oliver, the defendant in Stenz went inside a Senator's office. Stenz also had a prior offense for which he was serving a term of probation at the time of January 6. However, given Oliver's lengthy criminal history and lack of remorse, a comparable sentence is warranted.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is

"firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.    Intermittent Confinement for Oliver as a Condition of Probation

As a condition of probation, a court may order that the defendant be incarcerated "during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(1); *see also United States v. Little*, 78 F.4th 453, 461 n.7 (D.C. Cir. 2023) (section 3563(b)(1) "contemplates *short* periods of confinement like 'nights' and 'weekends' interspersed throughout probation"). The statute was designed to give courts flexibility in the "fashioning of conditions of probation in order to make probation a useful alternative to a term of imprisonment." S. Rep. No. 98-225, at 59 (1983). Because Oliver has pleaded guilty to violations of 40 U.S.C. § 5104(e)(2)(D) and (e)(2)(G) (second-degree misdemeanors), the statutory maximum of total confinement the Court may impose under § 3563(b)(10) is six months.

Judges in this district have imposed intermittent confinement as a condition of probation in many January 6 cases. *See, e.g.*, *United States v. Cameron*, 22-cr-17 (TFH), ECF No. 36 (D.D.C. Aug. 17, 2022) (imposing 30 days of confinement in three-day intervals as condition of three years

of probation); *United States v. Vuksanaj*, 21-cr-620 (BAH), ECF No. 43 (D.D.C. Apr. 29, 2022) (imposing 42 days of confinement in 14-day intervals as condition of three years of probation). While the statute refers to multiple intervals, a single short interval is also permissible. *See, e.g.*, *United States v. Valentin*, 21-cr-702 (JEB), ECF No. 65 (D.D.C. July 17, 2023) (imposing single 10-day interval of confinement as condition of 12 months of probation); *United States v. Escalera*, No. 22-cr-364 (APM), ECF No. 36 (D.D.C. Aug. 8, 2023) (imposing single seven-day interval as condition of two years of probation); *see also* S. Rep. No. 98-225, at 99 (noting that statute was intended to permit a single "brief period of confinement").

Here, a condition of intermittent confinement for Oliver totaling 14 days is sufficient, but not greater than necessary, to serve the purposes of sentencing under 18 U.S.C. § 3553(a)(2).

## VII.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[4] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Mullsteff and Oliver must each pay $500 in restitution, which reflects in part the role they played in the riot on January 6.[5] Plea Agreement at ¶ 11 (Mullsteff) and ¶ 12 (Oliver). As the plea agreement reflects, the riot at the United States Capitol has caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.*  Mullsteff and Oliver's restitution payments must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 103 (Mullsteff) and ¶ 103 (Oliver).

**VIII.   Fine**

Mullsteff's conviction for violation of 18 U.S.C § 1752(a)(1) subjects him to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). Mullsteff's guidelines range for a fine is $200 to $9,500. U.S.S.G. § 5E1.2(c).   Oliver's convictions for violations of 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G) subject him to a statutory maximum fine of $5,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, this Court should consider Mullsteff's and Oliver's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).

---

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

The burden is on the defendants to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, neither Mullsteff nor Oliver has shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e).

Under § 5E1.2(d), courts shall consider:

(1) The need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

(2) Any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

(3) The burden that the fine places on the defendant and his dependents relative to alternative punishments;

(4) Any restitution or reparation that the defendant has made or is obligated to make;

(5) Any collateral consequences of conviction including civil obligations arising from the defendant's conduct;

(6) Whether the defendant previously has been fined for a similar offense;

(7) The expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and

(8) Any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d). *See* 18 U.S.C. § 3572(a).

Given both defendant's ability to pay and significant net worth, it makes sense to impose a fine to adequately deter future criminal conduct and to reflect the seriousness of the offense. Furthermore, since both Mullsteff and Oliver's conduct and other factors warrants a harsher punishment than Pettit, imposing a fine equal to the amount that Pettit was sentenced to pay is warranted.

## IX.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Mullsteff to 60 days of home detention as a condition of 36 months' probation, a $5,000 fine, and $500 restitution. The government also recommends this Court sentence Oliver to 14 days' intermittent confinement as a condition of 36 months' probation, a $5,000 fine, and $500 restitution. Such sentences protect the community, promote respect for the law, and deter future crime by imposing restrictions on Mullsteff's and Oliver's liberty as a consequence for their behavior, while recognizing their acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/ *Kyle R. Mirabelli*
KYLE R. MIRABELLI
Assistant United States Attorney
N.Y. Bar No. 5663166
601 D Street, N.W.
Washington, DC 20530
(202) 252-7884
Kyle.Mirabelli@usdoj.gov